May it please the Court, President Counsel, my name is MJ Hayden. I'm with the Federal Public Defender's Office for the District of Alaska, and I'm here representing Mr. Arteaga on an appeal from the denial of his 2255 petition. At this time, I would like to reserve two minutes for rebuttal. We're here today because of a major factual error, a major factual error that fooled the trial court and that fooled this court, a major factual error that connected Mr. Arteaga to a certain apartment where two Western Union, two SIND receipts were found. Well, you say it's a major factual error, but didn't the landlord of the apartment, Mr. Crosby, give testimony in the trial that Mr. Arteaga, although he had a different apartment, resided in this apartment, visited it frequently, stayed overnight in the apartment, and, you know, once was involved in a fire in the apartment? In other words, the landlord said he resided there, and the landlord had firsthand knowledge. So how can you – how can we say it's a factual error? Well, Your Honor, I believe that although Mr. Crosby did testify – Well, let me say, am I right in what I said Crosby said? Yes, sir. And he said that under oath in the court? Yes, sir. But at the same time, there was no time parameters put on what he saw. He stated that Mr. Arteaga stayed there on and off, that he didn't stay there all the time. Mr. Arteaga's name was not on the lease. In the apartment, the only thing that was found that connected him to that apartment was a court receipt bearing the name Jose Arteaga. There was no key found. There was no personal property found, no clothing, no mails, no bills. All that's a so what in my analysis. Maybe I'm missing something, but if the landlord – if that's the only thing that's presented, but if the landlord says he resided there, and the jury was there on and off, I don't see that a jury needs other evidence to say – to conclude he resided there. Well, Your Honor, the landlord had no personal knowledge of what Mr. Arteaga did when he was in that apartment or why he went in and out. The landlord was unable to say whether or not – I believe there was testimony that when he was in the apartment with another of the co-defendants, whether they played music, whether they ate dinner, why he was in that apartment. So to make the leap from the fact that he had access to that apartment to making that apartment his residence, I think it's beyond what Mr. Crosby testified to. I think Mr. Crosby used the word reside, didn't he? Well, that was Mr. Crosby's opinion, although he did not – But didn't he use that word? I believe that Mr. Butler used that word and Mr. Crosby agreed with it. Mr. – Mr. Butler was Mr. Arteaga's counselor. Right, right. But when a witness is asked a question, it's not objected to and there's a word in the question, whether it's leading or not, and the witness says yes or adopts the language of the question, isn't that the witness's testimony? I still think that it was a great jump to go from the fact that he had access and could go in and out of the apartment to making it his residence. There's a fine distinction there. And that's what this Court relied on during the appeal, was the fact that it was uncontested during the appeal that the apartment was Mr. Arteaga's residence, not that he had access and could go in and out of the apartment. I think all that's fair argument to a jury. The only thing I was questioning was your statement that it was a leap in terms of the evidence, but I don't want to disrupt your whole argument, so go ahead in whatever you like. Yes, Your Honor. What we're talking about is two Western Union receipts that were found inside of a certain apartment, Unit 10. And Mr. Arteaga contends that throughout the government's argument, not only at the Rule 29 hearing, but in closing, that the government made several misstatements of facts trying to connect Mr. Arteaga to that particular apartment, the most outrageous of which concerned a state court receipt bearing the name Jose Arteaga, which the government argued to the court was found among or with the Western Union receipts, when in fact ---- I'm having trouble getting my feet under me here with the argument. I think I'm pretty much familiar with what happened at trial and what happened at the court of appeal the first time around. What I'm trying to figure out is what's the legal hook that we are supposed to have here to get at this determination? That is to say we have a jury conviction, we have an affirmation on appeal. What legal argument are you making now that allows us to reopen all this? Well, what happened during Mr. Arteaga's appeal, after that appeal he filed a motion to recall the mandate that went to this court. This court reviewed that and decided because it was so factually specific that that should be taken up as a 2255 in the district court, which he did. The district court summarily denied his motion, which brings us here today on a certificate of appealability. And what's the legal hook that you're using that would allow us, if we agree with you, to reopen and to reverse or reopen and to set aside? Basically, if the government has relied on or misstated the evidence, whether it be in closing or at the Rule 29 hearing, then Mr. Arteaga ought to be allowed, his case ought to be reversed and remanded for a new trial. It seems to me your argument, and I don't mean this to suggest I've made up my mind. I'm still listening. It seems to me, unless I'm missing something, that it boils down to saying that it's government misconduct for the prosecutor to argue a theory of evidence that was admitted, that was in a witness's testimony. So Crosby said the guy resided there, and the government argued that was his residence. And your argument, you're telling us that because of the qualification or lack of full knowledge of Crosby about what he did there, that it was misconduct for the government to argue the facts that the witness had stated in his testimony? Well, Your Honor, we're not only arguing that the government mischaracterized the apartment as being Mr. Arteaga's residence, but there were other things that the government argued all pertaining to Unit 10 that were either evidence that was inadmissible or just a straight-out misstatement of the facts. And one of those pertains to the fact that the government argued that Mr. Arteaga resided at the Mayfair residence where a witness came in and said that he thought that Mr. Arteaga was a man named Carlos Marino. Well, the Unit 10 apartment was rented in the name of Carlos Martino when, in fact, the Mayfair apartment was not rented until November after the search and the recovery of the Western Union receipts at Unit 10. I'm having trouble seeing that that proves government misconduct. Let me ask another question. I understood that there was a police officer, Officer Kress, I think, who went into this Unit 10 and talked to a guy who said his name was Marino. So Kress thinks that he's talking to Marino, and the Marino he's talking to tells him that Arteaga resides in this bedroom in one corner of the apartment when he's there. When he's there, that's his bedroom. And is that correct? Yes, Your Honor, that is correct. That's hearsay. That's hearsay. But as I understand it, when it was elicited at trial, there was no objection to it. And I thought the rule of evidence law was always that unobjected to hearsay is admissible for any purpose. Well, Your Honor, if you'll review the transcript of the Rule 29 hearing, that testimony was actually elicited by Mr. Arteaga's counsel. And in the Rule 29 hearing, he did make mention that he believed that it was an admissible hearsay to be used to support that fact because Mr. Marino never testified. And so, therefore, there was no objection to it. But he elicited the testimony? Yes, he did, Your Honor. Did he object to the testimony he was eliciting? No, he didn't, Your Honor. Well, then isn't it admissible? As I go back to the rule of law that I'm reciting, and maybe I'm wrong about it, but I thought the rule of law, of evidence law, was that unobjected to hearsay is admissible for any purpose. In other words, a party has to object to hearsay to make it inadmissible. If they object, then a court reviews whether it's in any exception as a hearsay. But if they don't object, it just comes in. I believe Mr. Butler thought when he made his argument that it was inadmissible because it was the statement of a party that wasn't up for it. I'm asking what he believed. I'm asking if he objected. No, he didn't. Or moved to strike it. If he elicited it from a witness, then if he said, I moved to strike that hearsay. But he didn't do that, right? No, he didn't, Your Honor. Which brings us to the second of Mr. Archiega's arguments. Your time has expired, so we'll give you two minutes for the second point. What have you contended constitutes ineffective assistance? The failure to object to the government's misstatement of facts, not only at the Rule of Law, but also at the defense counsel's argument. Okay. And that's it. Did the defense counsel argue to the jury that there was insufficient evidence and that these documents should not be attributed to Archiega because he really wasn't the person who was residing in the apartment? The defense counsel's argument alluded to that, but that was not the major focus of his argument. Okay. But do you have an objective that his argument was ineffective, that he failed to argue that the evidence shouldn't be attributed to Archiega because he didn't live in the apartment? Your Honor, we're bound by what the Certificate of Appealability allows us to appeal, and the appeal was that or the Certificate of Appealability allows us only to appeal that he was ineffective and not objecting to the government's arguments. And did you below or urge he was ineffective in other ways? Below was a pro se petition, and Mr. Archiega did not allege that. Do you happen to know what the – was the petition for rehearing filed late in the last – when the case was up on the merits, on the appeal, and they didn't recall the mandate? Was – why was there a question of recalling the mandate? Was the petition late? I don't believe the petition was late. It's my understanding that when this Court – it wasn't actually filed an entitled motion for rehearing. It was filed a motion to recall the mandate. And this Court reviewed that and decided that it was so factually specific that it would better be looked at. But normally the mandate wouldn't issue before the time to file a petition for rehearing had run. I'm sorry, Your Honor. I didn't understand your last question.  had run. Are you saying there was no petition for rehearing? No, there was no petition for rehearing. And after the time for a petition for rehearing had run, then a motion to recall the mandate was filed? I'm not exactly sure on that, Your Honor. I believe that that's the posture of the case, but I'm not absolutely sure. I would have to look at the documents. There was a lawyer at that time, too, wasn't there? There was only a lawyer on the direct appeal.  There was a lawyer on the direct appeal. Yes, sir, Your Honor. But there was no lawyer on the motion to recall the mandate. Nobody filed an ineffective assistance claim as to that yet. Yes, sir, Your Honor. Yes. Yes. No. Yes. No one has done it. Thank you. Thank you. Please, the Court. Good morning, Your Honor. Steve Scrocchi, Assistant U.S. Attorney, Anchorage, Alaska. I was the trial prosecutor in this case. This case was a very large mosaic of different pieces. And there was no error by the government either in closing argument or before the Ninth Circuit Court of Appeals concerning any statements raised by Mr. Arteaga that acted. I haven't seen the transcript, so it's a little hard to piece together from these briefs exactly what happened in that trial. Yes, sir. What happened is what happened that they found some documents and they said this is what is why Arteaga is guilty because these documents established that he bought the money orders or whatever he did. And the reason we know that this was done by Arteaga is because it was his apartment. Correct. Is that basically the case against Arteaga? It's a little deeper than that, if I might, Your Honor. My understanding was, but before you respond, just in a nutshell, that Arteaga was convicted of a whole bunch of other things based on direct evidence, like selling drugs, some other money laundering counts, and that the only thing that this argument about this Unit 10 apartment and the receipts in it relates to are two counts. Correct. And my view of the evidence is there's direct evidence in the Crosby testimony that links him to the receipts there. Yes. Plus all the other evidence is circumstantial. Yes. It's not, like, irrelevant. So I don't think the other evidence is irrelevant to these counts. The only thing you're going to see in the briefs that, in response to your question, Judge Reinhart, that Ms. Hayden didn't discuss is that when the officer, Officer Reinhart, was in the apartment, he had his report on the stand. His – in Volume 11 of the transcript, the government's S.E.R. 1312 to 1323, he had his report on the stand with him. He referred to it when he testified. He said that items such as cash, airline tickets, the two Western Unions that are at issue were found in the bedroom. I examined his testimony very closely in accordance with his report. His report says the Western Unions were found – I'm sorry – that a receipt bearing Arteaga's real name was found in a closet, not in the bedroom. That wasn't discovered by anybody at trial. It wasn't discovered by anybody in front of the Ninth Circuit. The argument that I made in closing argument varied – and the words that I used varied between this was his residence, this was his apartment, and I mentioned one time that these items were found in his bedroom. The government's position is that it has no effect as to the factual aspects of this case, because what was found in the apartment, along with the identification from the landlord, that this man lived here, we are permitted to argue to the jury and to this court, we have actual eyewitness testimony, that this man lived in this apartment. It doesn't matter that – and the jury was free to reject all of these items, and they did. It doesn't matter that they didn't know what kind of music was played or what they talked about when they were inside the apartment. Frankly, people would probably be shocked if a manager knew that much. But what he said was he lived there, and what they found inside the four walls of that apartment was a receipt from the State of Alaska court system in Mr. Arteaga's real name with an address that the government linked to other Western Unions. In Mr. Arteaga's room? In the apartment. In the apartment. Oh, in the apartment. He wasn't the only one who lived there. No. Apparently Mr. Moreno, who the defense elicited testimony from, lived there as well. Well, my law said that Mr. Arteaga lived there from on and off, that he also lived in another apartment. Yes. Sometimes he spent time at one, sometimes at another. Yes, sir. And that there were other people who were on the lease. Is there only one other person? Is Moreno the only one on the lease? No. The other person on the lease was an individual we identified. Her true name, as far as we know, was Jenny Arango Laverde. However, she used an alias and was identified by the landlord. She used an alias. So there were at least three people in who spent time at the apartment? No. Ms. Arango Laverde only was up in Alaska for a week and went back to Los Angeles after that. And the Ninth Circuit panel below specifically addressed this issue and stated that somebody else might have been in the apartment. Somebody else might have used those aliases. Somebody else might have done those Western Unions. But the jury heard all that evidence and they were free to disregard it. And, in fact, Mr. Butler, who was Mr. Arteaga's counsel at trial, and I believe on appeal, indicates at the records 215 – government's 215 to 219, he goes into an extensive argument about why the jury should not believe this paper bridge, as he called it, that the government put on, that we didn't bring any handwriting exemplars, we didn't bring any experts to say Mr. Arteaga had actually, you know, been the one at the kiosk sending the money back. And he asked the jury himself to reject this argument. Just to clarify something for me, I understand the receipt with his name on it's found somewhere, according to the policeman's report, maybe somewhere else in the apartment, not the bedroom. It was in a closet hallway. Okay. But were the Western Unions found in the bedroom or were they found somewhere else? The Western Unions, as far as I recall, were found in the bedroom. Okay. Now, am I right that this Officer Kress gave hearsay testimony that it was not objected to? Correct. It was listed by his counsel. It was a no motion to strike. Yes. But Officer Kress's statement got before the jury with no objection that the bedroom was Arteaga's. Correct. And, in fact, Your Honor, the government or I, since I made the closing argument, I never argued to the jury that Mr. Moreno said Mr. Arteaga lived in this apartment. Our case was built on a mosaic of connections of aliases and addresses that all interlinked and interconnected. And the panel below recognized that. It involved ten defendants over a significant period of time. And Mr. Arteaga was involved in five hand-to-hand sales of cocaine that were photographed, that were wired, and those wires were played in front of the jury during the course of that trial by the officer who made the arrangements. Was he involved in other money laundering, Mr. Arteaga? Yes. There was another Western Union which makes the connection between the one found, I'll call it, in the apartment that Mr. Arteaga used as our assertion. Our assertion was he used his real name, Jose Fernando Arteaga, with an address of 100 Bunnell. And that exactly mirrors the receipt found from the State of Alaska in the apartment, Jose Fernando Arteaga. Now, so is the other evidence of Arteaga selling drugs or doing other money laundering, is that relevant on the issue of whether these Western Union receipts were his? It is relevant because it establishes a pattern between Mr. Arteaga and other co-defendants. Because some of the addresses on the Western Unions that issue, the two specifically, are listed as 5410 and it's written out as Mokenbird, M-O-K-I-N-B-I-R-D. Mr. Arteaga is of Spanish descent and he had a hard time speaking English. That's not something we argued to the jury, but it sort of spoke for itself. And those addresses we linked up to his sister, Clara Patricia Arteaga, as the receiver of those Western Unions in Los Angeles. And that was the theory of the government's case. So it's not just what was found in the apartment. There's a web or a link to other pieces of evidence from the case from other co-defendants that we felt enabled us to argue permissibly that this is Mr. Arteaga's. How many counts was Arteaga found guilty of? Count one was the conspiracy count, Your Honor. And then I don't have off the top of my head the number of money laundering counts. I believe all of them were affirmed on appeal. I'd be with these two at issue now. Well, I wouldn't take a great deal of comfort from what you say that this Court did the last time. In its order, in which it relies on the unfortunate case of Calderon v. Thompson, for when you can recall the mandate, it found that a bar to looking into what it found disturbing about the government's reliance on this testimony. They did not find the government's answer sufficient to relay their concerns, and they said that they had doubts that it would prove that he had dominion and control over the apartment. Then they said despite their misgivings about the state of the evidence, they're not going to decide it because of Calderon v. Thompson. So that's why they call on their own for a hearing into this, because they did not find there's just such a simple run-of-the-mill, well, there's evidence in the record, therefore it's all okay. And he did a lot of other things, so it's okay. They found that convicting him on this count, on the theory that he had dominion and control over the apartment, was highly dubious. In this case, Your Honor, I think the distinguishing factor is there's an eyewitness who says this man lived there, he cooked there, he went in and out, he associated with his friends. If the Court finds that was an error, our position would be if you find that is an error, then the remedy would be to vacate the two money laundering counts, but that in no way, absolutely no way affects the remainder of the convictions in this case, given the substantial amount of evidence against Mr. Archiaga, which was a firm opinion. But I'm not, despite what I said, I'm not saying that, the issue before us isn't really the inadequacy of the evidence. I mean, I think we find ourselves in one of those procedural quandaries that the courts have managed to create, where you can't look at the merits of the case, or you can't look at what's right or what's just, but we're looking through all these procedural obstacles, and then we end up with what does the certificate of appealability tell us an issue is. And the prior panel, which had serious doubts about the sufficiency of the evidence, returned it to, and for a 2255 motion. And now we're on a much more limited inquiry. Can I address that, even though my time is over? Yes. But the inquiry, as I understand the issue before us, it's not whether there was sufficient evidence. It's whether there was any misconduct in the characterization of the evidence. Well, I think the two go hand in hand, Your Honor. Excuse me. And the second issue we have is whether counsel was ineffective in not objecting to certain limited things. And counsel tells us that it's not even whether he was generally ineffective, but only ineffective in failing to object to certain items of evidence or testimony. And that's all we have, as I gather it. Is that wrong? Permission to address. May I have permission to address you on that issue? Yes. The point of bringing all this evidence back is not to establish sufficiency. It's to show why there's no misconduct, why there wasn't any error, and how that closing argument that we kept to our bargain with the Court with these limiting instructions, and nobody who was involved in that trial, from the district court judge to the defense lawyers, nobody breathed a word about misconduct or about going outside the scope of the judge's instructions. And so the point is, bringing all this to Your Honor's attention, is to say we applied to comply with the Court's ruling. Here's why the word bedroom was mentioned, because the officer says on the stand that it was found in the bedroom. That was fully consistent with the trial testimony. It was never disclosed until well after the fact that it wasn't found in the bedroom, that he was in error. But he had his report on the stand so someone could have looked at it. The ultimate issue for the jury to decide was not whether Mr. Arteaga resided in the apartment. The question is whether or not there's a sufficient connection between him and these pieces of paper that were found there. It would have been enough, for example, I'm not making this up, if there had been a case where he showed up there on July the 3rd and dropped three pieces of paper. That was the only thing that was ever in the apartment. What you want to establish is a connection between him and the pieces of paper. You don't need to establish that he resided there in the sense of technical definition of reside. Your argument is, however, that he did reside there as one of at least two places. And I read your argument to the jury. It says, well, he had two residences, more than one residence. Constantly. Yes. I just don't see the mischaracterization of the evidence. You're pushing it your way. Absolutely. But the testimony is that he lived there from time to time. You say he had two residences. I don't get it. We agreed with that position, Your Honor, but nevertheless, given the allegation of improper argument, we have to respond in time. I understand. Anything else, Your Honor? Thank you. Thank you very much. I just wanted to clarify a couple of issues. The Court was saying that these ‑‑ this argument only went to the two Western Union receipts found in Unit 10, when, in fact, we would submit that it not only goes to those two Western Union receipts, but it also goes to the other, I believe, eight counts involving other Western Union receipts. Because what was allowed to happen was because the government inferred that if you found Mr. Artiega guilty of the two Western Union receipts found in Unit 10, you could infer that he sent the other Western Union receipts because of the interconnection of the addresses and the names on the receipts. Furthermore, these Western Union receipts were overt acts listed in the conspiracy. This case was tried in October of 1994, and at the time, the standard jury pattern instruction that Judge Sedgwick gave instructed the jury to find and agree on one of the overt acts. So, in addition, there was also a multiple conspiracy instruction given. Weren't his sales of drugs overt acts? Pardon me? Weren't his sales of drugs overt acts? Yes, sir. And those ‑‑ the Western Union stopped in October, and the drug sales that were listed as overt acts in the indictment began, I believe, in February. And that was the basis for the multiple conspiracy instruction. So even though the jury could have found him guilty or believed that he participated in the drug sales, we don't know whether they might have thought that that was part of the other conspiracy, the separate conspiracy under the multiple conspiracy instruction.  And I think that's a good point. Now, let me make sure I understand. For you to win, I think you've got to persuade us either that there was prosecutorial misconduct or ineffective assistance of counsel. Those are your two hooks. Yes. And the prosecutorial misconduct is overstating the evidence in closing argument and overstating it in appeal to us? Yes, sir, in making misstatements regarding what took place in Unit 10. And ineffective assistance of counsel is failure to object to the mischaracterization of evidence during closing argument? And failure to raise it on appeal. And failure to object to the same sort of, as it were, mischaracterization of evidence on appeal. Yes, sir. That's all I have. Thank you. Thank you, counsel. The case is arguably submitted. The next case is United States v. Ceja Prado. Thank you.
judges: Reinhardt, W Fletcher, Gould